363 A.2d 1178
COMMONWEALTH of Pennsylvania
v.
Solomon BASTON, Appellant.

Superior Court of Pennsylvania.
Sept. 27, 1976.

John W. Packel, Asst. Public Defender, Chief, Appeals Div., Philadelphia, for appellant.

Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

JACOBS, Judge.

Appellant, after a jury trial in August of 1973, was found guilty of assault and battery, aggravated robbery, and corrupting the morals of a minor. Post-trial motions were filed by appellant's appointed trial counsel, but argued by appellant's second appointed attorney, as appellant's trial counsel was relieved of his assignment.[1] Post-trial motions were denied on March 26, 1974, and appellant was sentenced to a term of incarceration of four to ten years. No direct appeal from the judgment of sentence was taken, and on April 11, 1974 appellant filed a petition for relief under the Post Conviction Hearing Act.[2]

1. This case was tried before Judge LOWE. During the trial, appellant expressed to Judge Lowe his dissatisfaction with trial counsel's representation, and asked that trial counsel be discharged. Judge LOWE denied this request. N.T. at 54–56. After the jury returned a verdict, appellant again requested the discharge of his trial counsel, at which time trial counsel went before Judge CARSON and was relieved of his assignment. N.T., Post Conviction Hearing Act Petition, June 13 and 26, 1974, at 47–48. Appellant was given another attorney. The record reveals that boiler plate post-trial motions for a new trial were filed by appellant's trial counsel, but argued by appellant's second attorney.

2. Act of January 25, 1966, P.L. (1965) 1580, § 1 et seq., 19 P.S. § 1180–1 et seq., (Supp.1976–77) [hereinafter referred to as PCHA]. Appellant was advised by his attorney that there were no

PCHA hearings were conducted on June 13, 1974 and June 16, 1974, at which appellant, his wife, his son and appellant's trial counsel testified. PCHA testimony was also taken on August 15, 1974, September 20, 1974, and October 15, 1974. Appellant was represented by a member of the Defender's Association throughout the PCHA proceedings, and is presently represented by the same attorney. By order of December 11, 1974, appellant was granted the right to file a direct appeal *nunc pro tunc*, however, the petition for PCHA relief was otherwise denied.

On May 6, 1975, a *Joint Petition for Remission of the Record* was filed, and, by order dated May 19, 1975, we remanded the record for further proceedings on the PCHA petition.[3] Upon remand, the court below, in a conclusory opinion on an issue of ineffective representation, found that trial counsel "ably and vigorously represented the defendant," and that appellant was not denied the effective assistance of counsel. The court then reaffirmed appellant's right to file a direct appeal *nunc pro tunc*. The instant appeal followed in which the appellant submits allegations of trial error, and the issue of ineffective representation,[4] the former pursuant to his right to file

grounds for a direct appeal, but that there might be grounds for PCHA relief. N.T., Post Conviction Hearing Act Petition, August 15, 1974, at 6. The PCHA petition submitted four grounds for relief: (1) the Commonwealth used perjured evidence against appellant at trial; (2) appellant was not permitted to present an alibi defense; (3) ineffective assistance of counsel; and, (4) appellant was precluded from effective participation in the jury selection.

3. The basis for the *Joint Petition for Remission of the Record* was *Commonwealth v. Johnson*, 460 Pa. 303, 333 A.2d 739 (1975). The petition submitted that although the lower court was permitting an appeal *nunc pro tunc*, the lower court should have resolved the ineffective assistance of counsel issue.

4. Appellant submits five theories of ineffective assistance of counsel. Because we conclude that one theory alone, *see* text infra, supports the ground for relief of ineffective representation we do not reach the other four theories. Moreover, we need not consider the allegations of trial error submitted pursuant to the right to file an appeal *nunc pro tunc*.

an appeal *nunc pro tunc.* We focus only on the ineffective representation challenge, and grant the appellant a new trial.

An evaluation of counsel's stewardship of his client's case is always one of the most formidable and troublesome inquiries an appellate court encounters.[5] For it would be a rare breed of litigator who, looking back upon his representation in a particular case, would be completely satisfied with his advocacy. It is precisely with these thoughts in mind that "our inquiry ceases and counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had *some reasonable basis* designed to effectuate his client's interests. The test is *not* whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decisions had any reasonable basis." *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 604–605, 235 A.2d 349, 352–53 (1967) (emphasis original) (footnote omitted). Applying this well-established standard, after independent and thorough review of the trial record and the notes of testimony of the PCHA hearings, we are constrained to conclude that appellant was deprived of effective representation. The nature of the theory upon which we base this conclusion requires a thorough explication of the case against the appellant.

The incident out of which the charges against the appellant arose occurred on the evening of January 2, 1973 about 9:30 P.M. On that evening, the complainant in the case at bar was returning home from a supermarket when he was stopped by a man who grabbed his hand and wished him a Happy New Year. The man was very persistent

---

5. As Mr. Justice Roberts appropriately observed in *Commonwealth ex rel. Washington v. Maroney*, 427 Pa. 599, 603, 235 A.2d 349, 352 (1967): "[N]o one, be they members of bench or bar, relishes an opportunity to evaluate the product of another attorney."

and shook the complainant's hand for about a minute. N.T. at 11. As the complainant was able to "pull away" from this man, he was jumped from the rear by four youths who knocked him to the ground and went through his pockets. The complainant testified, at the appellant's trial, that when the youths fled he noticed that the man who had stopped him was standing about fifty feet away watching the entire incident.[6]

A few minutes after the attack the police came upon the scene. None of the officers was called to testify, and it is at this juncture in the recitation of the facts that we encounter some difficulty.[7]

The police were able to immediately apprehend one of the youths, but the other three temporarily avoided capture. While patrolling the area for the three youths, the investigating officers received a radio report of a burglary at 4562 North Smedley Street. Responding to the broadcast, the police entered the residence on Smedley Street whereupon they confronted three youths. The appellant was also in the house. The three youths were taken into custody, and the appellant was brought to the police station to prosecute the youths for the burglary of his home.[8]

6. This was the last time the complainant saw this man until the complainant was at the police station later that evening. At the station the complainant identified the appellant as the man who stopped him to shake his hand. *But see* note 9 and the text accompanying note 9 infra.

7. Police reports were made a part of the PCHA record, and these are useful in reconstructing the incident.

8. The police report listed the appellant as the owner of the home. The testimony of the appellant at trial was that he was formerly the owner of the home, but that the deed had been transferred to his son.

His son, who did not testify at the trial, explained at the PCHA hearing that his father, on the night of the robbery, had been drinking heavily at his sister's home which was around the corner from the Smedley Street residence, and that he took his father to his home to "sleep it off."

One of the theories of ineffective representation was trial counsel's failure to have the son testify that the appellant was drunk

At the appellant's preliminary hearing, and again at his trial, the complainant testified that he identified the appellant at the police station. *See* note 6 supra.

Again, the facts become difficult to sort out. The police reports make no mention of the complainant's identification of the appellant.[9] The police reports do show that the four youths gave statements to the police which statements in essence admitted the robbery.[10] The youths also told the police that the owner of the house at 4562 North Smedley Street, whom they called "Mr. Goodie," set up the robbery. However, appellant was not arrested that evening; he was not arrested until February 21, 1973.

Trial commenced on August 15, 1973 with the Commonwealth's case consisting of the testimony of two witnesses, the complainant and Carl Odom, one of the four youths who admitted participation in the robbery.

The essence of the complainant's testimony we have already summarized in the recitation of the facts. The complainant was stopped by a man who grabbed his hand, detained him for about a minute, and repeatedly wished him Happy New Year. He pulled away and was immediately attacked by four youths. As the youths fled, he saw the man standing about fifty feet away watching the entire incident. He then testified that while at the station he identified, from clothing worn and features, appellant as the man who stopped him.

and in bed at the time of the attack. [The dispute on this issue is whether trial counsel made reasonably diligent attempts to contact the son.] The son was called at the PCHA hearing to relate what his testimony would have been if called at trial.

9. Appellant argues, and, the appellant's son testified at the PCHA hearing, that the appellant was asked, at the station, to say Happy New Year to the complainant, and that the complainant after hearing the appellant speak, said that appellant was not the man who stopped him on the street.

10. The circumstances under which the statements were given are not clear. In fact, the police report indicates that the complainant said he would not be able to recognize any of the males if he saw them again since everything happened so fast.

■ Certainly, this testimony, standing alone, would not be sufficient to convict the appellant. The complainant did not testify that he was struck by the appellant, that the appellant called out for the youths to attack him, or that there was any other connection between appellant and the youths. We make this observation because after a reading of the entire record it is apparent that the crucial testimony in the case was that of Carl Odom, one of the attackers, and it is in the cross-examination of Carl Odom that we find appellant was denied effective representation.

The essence of Carl Odom's testimony was that the appellant set up the robbery. He testified that the appellant, known to the youths as "Mr. Goodie," came to a park where the youths usually gathered, and shortly thereafter the youths and appellant got into appellant's car. They drove to a bar and Odom testified that the appellant told them that "he was going to make us get some cash, he needed it." N.T. at 28. The testimony was that the appellant went into the bar, came out immediately, and said to the youths "[y]ou so and so better get me some cash money, and I mean now." N.T. at 29.[11] Then the appellant went across the street, approached the complainant, shook his hand, wished him Happy New Year, and "grabbed the man by his arm, and that's when he told us to grab him and get the money." N.T. at 30.[12] He further

11. There was testimony that Carl Odom "knew" appellant had a gun in the trunk, although on cross-examination Odom admitted that he never saw a gun.

12. As noted, the complainant did not testify that the man who stopped him grabbed him by the arm or that the man called for the youths to attack him. However, according to Carl Odom: "So I grabbed one of his arms and Ronald grabbed one and Paul went in his pockets. And Mr. Goodie told him, 'Give me the money.'" N.T. at 30. We recognize, of course, that it was the jury's function to weigh the evidence and reconcile the inconsistencies in testimony. It was solely within the province of the jury to assess the precision or lack thereof with which Carl Odom and the complainant were able to recall the incident, and to evaluate their credibility in light of such recollection. We, however, note these inconsistencies to point up the import of an effective cross-examination of Carl Odom.

testified that as they fled the appellant came around the block and picked three of them up in his car, drove them to Smedley Street, and told them, when the police came, to act as if they had been there all evening.

With this rendition of the "facts" as Carl Odom recalled them, appellant's trial counsel began his cross-examination. It is counsel's cross-examination that is the gravamen of the ineffective representation challenge. The appellant frames the issue as follows:

> "Trial Counsel Failed To Cross Examine The Juvenile Accomplice To Establish That The Accomplice Had Agreed To Testify Against Appellant To Protect His Juvenile Probation And To Avoid Prosecution For The Offense In Question." Brief for Appellant at i.

Near the conclusion of the cross-examination appellant's trial counsel attempted to impeach the credibility of Carl Odom. The pertinent part of the record is as follows:

> "[Defense Counsel]:
>
> Q. Have you ever been involved in any other—
>
> "[Prosecutor]: Objected to.
>
> "[Defense Counsel]: His credibility is in question. I was going to ask him about any other convictions or arrests he might have had, Your Honor. I was under the impression it was a legitimate question.
>
> "[Prosecutor]: Objected to, Your Honor. I instruct the jury to disregard that question, Your Honor.
>
> "THE COURT: How old are you?
>
> "THE WITNESS: Fifteen.
>
> "THE COURT: Members of the jury, I would ask that you please not consider that question or any conceivable answer that might have been given to it. It is not relevant to your inquiries. It is not germane to what is before you and I instruct you to disregard it completely and in clarity.

"[Defense Counsel] : That's all, Your Honor."

[Defense counsel concluded the cross-examination] N.T. at 49–50.

 The issue, as heretofore stated, is the failure of defense counsel to pursue a "deal" between Odom and the Commonwealth. We perceive this issue to require a four-part analysis of the record: (1) was there a "deal;" (2) was defense counsel aware of the deal, and, if he was not, was the record of such nature that counsel should have been aware of the deal;[13] (3) could counsel, on cross-examination, have pursued the "deal;"[14] and, (4) as is most critical in cases of this nature, was defense counsel's cross-examination deficient when tested by *Commonwealth ex rel. Washington v. Maroney, supra.*

I

Was there a "deal?" On March 6, 1973, Carl Odom and the other youths involved in this case were before Judge Klein on the matter of delinquency adjudication. At the PCHA hearing the Commonwealth stipulated the following: "Your Honor, as part of the trial file of the District Attorney's Office in this case, there appears in one of the police form 75–49's the following information:

"On 3–6–73, at the Family Court of Philadelphia, 1801 Vine Street, the case was heard before Judge Klein with A.D.A. McKissock representing the Commonwealth.

---

**13.** Appellant would submit that if counsel (1) was not aware of the "deal;" and, (2) counsel should not have been aware of the deal then the issue would be, assuming the existence of a deal, one of after-discovered evidence. We do not reach this issue.

**14.** This analysis is necessary in that while it is axiomatic that a witness's bias, interest or inducement to testify is a permissible purpose of cross-examination, *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931), the parties have managed to obfuscate this point by interjecting the issue that if the deal was pursued Odom's juvenile record would have been revealed, and a disposition or adjudication in juvenile court is not a conviction for a crime, and, therefore cannot be used to impeach the credibility of a juvenile witness. *Commonwealth v. Katchmer,* 453 Pa. 461, 309 A.2d 591 (1973).

After the testimony the judge instructed the defendant to cooperate with the police in any other matter they were involved. . . . [as to Carl Odom specifically] that there would be no further prosecution due to the fact that these subjects had been found delinquent and . . . 'and further prosecution would serve no purpose.' " N.T. Post Conviction Hearing Act Petition, August 15, 1974, at 8–9. Near the close of the PCHA hearing appellant's counsel expressed his desire to have a Detective Morton, the detective assigned to this case, come in at a future date and testify. The court desired an offer of proof. Appellant's counsel's offer was that Detective Morton would testify to the deal. Eventually the Commonwealth stipulated: "Your Honor, I would stipulate that the prosecution was withdrawn against Carl Odom without prejudice . . . [Appellant's counsel]: Cooperation in testifying. [Commonwealth]: In testifying. Of course, it does not go either way as to whether or not Mr. Odom told the truth." N.T., Post Conviction Hearing Act Petition, August 15, 1974, at 40.

Further, at Odom's delinquency hearing, the youth gave a statement relating to the appellant's alleged involvement in other offenses, for which the appellant was held for grand jury after a preliminary hearing on April 25, 1973. At that hearing, Detective Morton stated the following:

" 'Your Honor, I was present at 1801 Vine [delinquency adjudication]. There was four boys. Each was represented by a lawyer. There was an agreement between their lawyers and the District Attorney's Office that the boys would testify as to the other robberies committed under the direction of this defendant, Solomon Baston, and that these boys would not be prosecuted for their testimony, any incriminating statement that they made on the other cases. They were arrested for one case. (Notes of Testimony from preliminary hearing, in the case of *Commonwealth v. Solo-*

*mon Baston,* held April 25, 1973, at Broad and Champ-
last Street, p. 6)'." Brief for Appellee at 17–18, n. 10.

There is no question that Carl Odom was given preferen-
tial treatment in return for which he agreed to testify
against the appellant.

## II

 Was defense counsel aware of the "deal," and if
not, should he have been? At the PCHA hearing defense
counsel testified: "After the trial was over and jury was
dismissed, the District Attorney Donald Joel was on the
side with the parents and with the juveniles, and although
my mind was elsewhere in regards to my own client's
problems, I did catch snatches of conversation in regard
to the possibilities of there having been a deal. But I did
not have any inkling of that until that point in time."
N.T., Post Conviction Hearing Act Petition, August 15,
1974, at 36. There is uncertainty in the testimony of de-
fense counsel as to what information, to-wit, police re-
ports, witness (Carl Odom) statements given to the po-
lice, defense counsel did review in his preparation for
this case. Without reaching the question of defense coun-
sel's actual knowledge of the "deal" [15] we conclude that
defense counsel should have been aware of the "deal."
We reach this conclusion for two independent reasons.
First, defense counsel represented, *see* N.T., Post Convic-

---

**15.** One might argue that the issue of counsel's actual knowledge, in
light of the testimony he gave, was an issue of credibility and, as
such, unassailable on appeal if there was sufficient evidence of
record to support the lower court's finding. However, the low-
er court simply found that appellant was "ably and vigorously
represented" by counsel. The Commonwealth submits that de-
fense counsel, with knowledge of the deal, employed a strategy
in not pursuing the deal. It is of course possible that the lower
court (1) *assumed arguendo* that counsel knew of the deal but that
counsel, as the Commonwealth suggests, employed "trial strategy;"
or (2) found that he did not know of the deal, but that the lack of
knowledge did not constitute ineffective representation, since if
counsel had known of the deal the same trial strategy would have
been employed.

tion Hearing Act Petition, June 13 and 26, 1974, at 75–76, the appellant on all of the other charges that came to light in the juveniles' statements given at the March 6, 1973 hearing. *See* text supra. We have already indicated Detective Morton's testimony at the preliminary hearing of April 25, 1973 on these charges. *See* text supra. Even the Commonwealth's brief submits that undoubtedly defense counsel, since he represented the appellant on these charges, was aware of the testimony given at the preliminary hearing.[16] Second, at the preliminary hearing on the charges involved in the instant appeal there is the following colloquy between Carl Odom and appellant's counsel.[17]

"[Defender]"

"Q. Have you ever been arrested before?

"A. Yes, I have.

"Q. Have you ever been convicted of anything before?

"A. No.

"Q. Have you ever been sent away?

"A. No.

"Q. Have any of these boys ever been sent away?

"[District Attorney]: Objection.

"The Court: Sustained.

"[Defender]:

"Q. You have been arrested before?

"A. Yes.

"Q. Are any of those cases still open, still against you?

"A. No.

---

**16.** The Commonwealth admits defense counsel's awareness of the deal, and then argues it was counsel's trial strategy not to pursue the deal. We, of course, consider the issue of strategy when we apply the test of *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967), in part IV of our analysis of this issue.

**17.** An attorney from the Defender's Association.

"Q. They have been taken care of?

"A. Yes.

"Q. Are you on juvenile probation?

"A. Yes.

"Q. You are?

"A. Yes." N. T. Prelim. Hearing at 23.

We conclude that on the basis of the record in this case the existence of preferential treatment to Carl Odom in return for his testimony was obvious.

### III

■ Could defense counsel, on cross-examination, have inquired about the "deal?" The answer, quite simply, is yes. It is "hornbook" law that a witness's motivation or inducement to testify is properly within the scope of cross-examination. *See Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Alford v. United States,* 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). However, the parties have managed to confuse what appears to be a clear issue. *See* note 14 supra.

■ Carl Odom had a juvenile record, and, as we have explained, one aspect of the preferential treatment given Odom in return for his testimony against the appellant was the continuation of his juvenile probationary status; the other aspect of his preferential treatment *was not to prosecute for the incident out of which the charges against the appellant arose.* Both appellant and the Commonwealth assume that the inevitable result of pursuing the "deal" would have been to place before the jury Odom's juvenile record. On the basis of this assumption, the appellant (1) concedes "the proposition that a disposition or adjudication in juvenile court is not a conviction for a crime, and therefore cannot be used to impeach . . . *Commonwealth v. Katchmer,* [453 Pa. 461, 309 A.2d 591 (1973)]" Brief for Appellant at 11; but (2) submits that under *Davis v. Alaska,* 415 U.S. 308, 94

S.Ct. 1105, 39 L.Ed.2d 347 (1974) *any* witness may be cross-examined to show bias or inducement for his testimony, even if that requires an examination of a juvenile's probationary status.[18] Brief for Appellant at 13–14. Appellant's argument is that albeit the cross-examination would have brought to light Odom's juvenile record, when tested in light of *Davis v. Alaska,* supra, defense counsel's cross-examination of Odom was deficient.

Initially, we observe that defense counsel's stewardship of this case is not tested in light of *Davis v. Alaska,* supra. Appellant's trial was conducted prior to the decision in *Davis v. Alaska,* supra, and we will not hold that counsel's representation was suspect for failing to be predictive of that decision. Fundamentally, the issue turns on whether the inevitable result of pursuing the deal would be the revelation of Odom's juvenile record. There is no reason advanced why counsel's cross-examination could not have been limited to the "deal" as it related solely to the dropping of the prosecution against Odom on this particular case. We conclude that defense counsel could have pursued the "deal," and that the revelation of Odom's juvenile record would not have been inevitable result of effective cross-examination.

## IV

We have gone to great lengths to indicate the critical nature of Odom's testimony, and we have no difficulty in

---

**18.** The Commonwealth does attempt to distinguish *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Since *Davis v. Alaska,* supra, does not control our disposition of this case, *see* text following this note, we do not find it necessary to say more than that we are not persuaded by the Commonwealth's attempt at distinguishing the case. The argument that Odom was an admitted accomplice, and, as such, the jury had a sufficient basis to assess his credibility, we believe is not supported by a close reading of *Davis v. Alaska,* supra.

Essentially, the Commonwealth concedes that *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) would permit questions relating to Odom's juvenile status, but submits that defense counsel's failure to pursue the deal was calculated trial strategy. *See* text following this note.

concluding that the testimony was of such import that it was essential, absent some calculated trial strategy, for the jury to be apprised of any motivation Odom might have had for implicating the appellant.

As noted, the issue, when a claim of ineffective representation is made, devolves to an application of the test articulated in *Commonwealth ex rel. Washington v. Maroney*, supra, to-wit, did trial counsel have "some reasonable basis designed to effectuate his client's interest." After a review of the record, we find no such discernable basis.

■ Initially, we reject the Commonwealth's attempt to "manufacture" a trial strategy. In return for preferential treatment, Odom agreed not only to testify against the appellant in the case at bar, but agreed to "implicate[d] [appellant] in five other criminal transactions." Brief for Appellee at 19. The Commonwealth submits that "[i]n the context of this case, where counsel had reason to know that the witness could testify to other criminal transactions in which both he [Odom] and appellant were involved, counsel made a wise strategic decision not to explore an area on cross-examination which could have elicited this highly damaging testimony." Brief for Appellee at 21.

The Commonwealth's argument suffers from two fatal defects. First, it is clearly a hindsight evaluation of the trial in no way supported by the record. Trial counsel had every opportunity at the PCHA hearings to offer some semblance of "trial strategy" for his failure to "explore the deal." This he did not do. In point of fact, recall that trial counsel testified that he was not even aware of the "deal." Second, there is no viable argument offered that the inevitable result of exploring the deal would have been Odom's revelation of appellant's alleged participation in other "criminal transactions." There is no reason we can perceive why trial counsel could not have attempted to elicit a limited response from

Odom, relating solely to preferential treatment in connection with his testimony on the charges in the case at bar.[19]

We are sensitive to the fact that it is most difficult in cases of this nature to found a conclusion of ineffective representation on a single act or a single failure to act on the part of defense counsel. However, after a thorough review of this case, we cannot escape the conclusion that Carl Odom's testimony was critical to the Commonwealth's case. The language of the United States Supreme Court in *Davis v. Alaska*, 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974) is particularly illustrative of the import of effective cross-examination in the case at bar:

> "We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning [witness's motivation for testifying] had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [witness's] testimony which provided *'a crucial link in the proof . . . of petitioner's act.'* *Douglas v. Alabama*, 380 U.S. 415 at 419, 85 S.Ct. 1074, at 1077, 13 L.Ed.2d 934. The accuracy and truthfulness of Green's testimony were key elements in the State's case against petitioner." (Emphasis added.)

---

19. The Commonwealth argues that "had it so chosen, [it] could have used the other crimes to show a common plan, scheme or design. Had defense counsel opened the door, the witness could have been questioned more about these other offenses tending to show appellant's *modus operandi* on redirect examination." Brief for Appellee at 21 (emphasis original). First, *assuming arguendo* that these "other crimes" in fact were admissible to show a common plan, scheme or design, they would have been admissible regardless of any defense "trial strategy." There is nothing of record to indicate that the Commonwealth would refrain from attempted introduction of this evidence only if defense counsel did not "open the door."

Effective cross-examination required that Odom's motivation to testify be explored.

Order reversed and a new trial granted.

WATKINS, P. J., and PRICE and VAN der VOORT, JJ., dissent.